**UNITED STATES**

v.

**Lindsey SCOTT, 407 78 9524 Corporal (E–4), U.S. Marine Corps.**

**NMCM 84 0447.**

U.S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 12 Oct. 1983.

Decided 22 Jan. 1986.

CDR DAVID C. LARSON, JAGC, USN, Appellate Defense Counsel.

LCDR JOHN B. HOLT, JAGC, USN, Appellate Government Counsel.

JOHN G. LEINO, Esquire, Civilian Defense Counsel.

GARY R. MYERS, Esquire, Civilian Defense Counsel.

Before KERCHEVAL, RAPP and GRANT, JJ.

RAPP, Judge:

This case had its genesis in a vicious attack on Mrs. Wendy S, the wife of a Marine lance corporal, which occurred on 20 April 1983 on board Marine Corps Development and Education Command (MCDEC), Quantico, Virginia.[1] Ultimately the appellant, a staff member in the Provost Marshal's Office (PMO), was convicted of attempted murder, rape, forcible sodomy, and kidnapping. On 12 October 1983 he was sentenced to a dishonorable discharge, confinement for 30 years, forfeiture of all pay and allowances, and reduction to pay grade E–1. Upon initial appeal to this Court the appellant asserted that he had been denied effective assistance of counsel. Rather than deciding the case on the basis of post-trial affidavits, this Court returned the case[2] for a *DuBay*[3] hearing, specifying several areas of inquiry. The extensive record of that hearing has now been returned to us including findings of fact by the military judge. Along with oral argument, both sides have submitted further briefs for our consideration.

I

The appellant was assigned Major R as detailed defense counsel and hired Mr. K, a civilian attorney practicing in the vicinity of the base.

In pretrial proceedings and at trial the appellant was represented by Mr. K, as lead counsel, and by Major R. After trial the appellant discharged Mr. K and hired his present civilian appellate counsel.

■ The starting point for our analysis is the sixth amendment of the United States Constitution which entitles an accused "to have the Assistance of Counsel for his defence." In the military context, such assistance has been effectuated by Articles 27 and 38, Uniform Code of Military Justice, 10 U.S.C. §§ 827, 838, which provide an accused with a variety of options to ensure the availability of defense counsel, whether provided by the military service or hired by the accused. While these provisions are of foundational value, the right to counsel is more than the mere physical presence or the availability of counsel—it is the "right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). The definition of "effective assistance" has shown wide variance in its evolution. The same tendency to variation has been apparent in the case law delineating when ineffective assistance warrants a remedy. In comparison to the federal courts, military case law is reasonably consistent. In *United States v. Rivas*, 3 M.J. 282 (C.M.A.1977), the Court of Military Appeals (CMA) applied a standard requiring a defense counsel to exercise the customary skill and knowledge which normally prevails within the range of competence demanded of attorneys in criminal cases, i.e., to "act as a diligent and conscientious advocate on behalf of his client." 3 M.J. at 288. A requirement for prejudicial effect, although not specifically discussed, was nevertheless implied. Later, in *United*

---

1. The facts will be amplified below.

2. *United States v. Scott,* 18 M.J. 629 (N.M.C.M.R. 1984).

3. *United States v. DuBay,* 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967).

*States v. Jefferson,* 13 M.J. 1 (C.M.A.1982), CMA approvingly noted the standard of competence set forth in *Rivas* and also cited the two-part test of competence and prejudice delineated in *United States v. DeCoster,* 624 F.2d 196 (D.C.Cir.1979) (*en banc* ), *cert. denied,* 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 311 (1979), that "before an accused could prevail on the issue of ineffectiveness of counsel he had to demonstrate: (1) 'serious incompetency' on the part of his attorney; and (2) that such inadequacy affected the trial result." *Jefferson,* 13 M.J. at 5 (quoting *DeCoster,* 624 F.2d at 208). Recently the U.S. Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), reviewed the various positions of the lower federal courts and announced a definitive federal rule. Military courts have historically looked to federal standards on the issue of effectiveness of counsel. The military rule drawn from *Rivas* and *Jefferson* is not at variance with *Strickland* and appears to emanate from a common philosophy, so we conclude that the *Strickland* rule is applicable to courts-martial. *See United States v. Davis,* 20 M.J. 1015 (ACMR 1985).

## II

The *Strickland* rule has two components: deficient performance and resulting prejudice to the accused. 466 U.S. at ——, 104 S.Ct. at 2064, 80 L.Ed.2d at 693.

## A

First we will look at the alleged inadequacies of Mr. K. *Strickland* specifies that the requirement for attorney performance is "reasonably effective assistance," applying an "objective standard" of reasonableness "in comparison to prevailing professional norms." Reasonableness must be judged in the context "of the particular case, viewed as of the time of counsel's conduct," evaluating that conduct "from counsel's perspective at the time." To avoid the temptation of second-guessing and distortion from hindsight, judicial scrutiny must be "highly deferential," and

courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.,* 466 U.S. at ——, 104 S.Ct. at S.Ct. at 2064–2066, 80 L.Ed.2d at 693–695.

The trial and *DuBay* records are replete with actions, inactions, and explanations by Mr. K which the appellant now utilizes in a broadside attack on Mr. K's representation going far beyond the original assignment of error, which focused on Mr. K's failure to prepare and present a viable alibi defense at the appellant's trial. We will concentrate on the original assignment of error, in particular examining Mr. K's development of the alibi defense in relation to Pam B and Cynthia A, both employees at Zayres Department Store where the appellant alleges he was present at the time of the crimes for which he was convicted. This is the only issue we believe is sufficiently supported by the evidence to warrant consideration.

According to the appellant, Mr. K failed to interview a single potential alibi witness personally or even by telephone and took no steps to seek out any such witnesses, for instance by retracing the appellant's claimed movements on the evening in question. The record supports this contention except for (1) the possibility of a brief meeting by Mr. K with the key alibi witness (Cynthia A) shortly before her testimony; and (2) perusal by Mr. K of a report by Naval Investigative Service (NIS) agents outlining fruitless attempts to verify the appellant's alibi. Although Major R, an apparently well-qualified counsel, was available and willing to assist, Mr. K purposely excluded him from the investigation of an alibi defense except for an hour or two spent by Major R in a time/distance study of the appellant's claimed activities on the evening in question. On the basis of these scant activities by Mr. K it is hard for us to see how he was developing any kind of credible alibi defense until as late as two to three weeks before trial (about *five months* after the crimes). At that time Lori J, a self-described civil rights activist, entered the case at the request of the ap-

pellant and offered her services to Mr. K free of charge. Lori J was not a trained or licensed investigator, nor did she have any demonstrated experience in criminal investigations. She perceived her role to be locating potential alibi witnesses for further development by Mr. K and vigorously set out on her quest, retracing the appellant's reported activities on 20 April 1983. Her efforts were futile until she reached Zayres Department Store in the nearby town of Woodbridge, Virginia, where the appellant claimed he shopped between approximately 2000 and 2030 on the night Mrs. S was assaulted. There she located Pam B, who was named by the appellant as selling him a soft drink. Pam B had been interviewed by NIS agents shortly after the crime but, on the basis of a single black and white photo shown to her, could not identify the appellant. After viewing several color photographs of the appellant provided by Lori J, however, Pam B specifically recalled serving the appellant and related the time of day to a particular task she routinely performed then, but she could not specify the date. Fortuitously, Lori J also located a member of the Zayres security department not previously known to the defense, Cynthia A, who remembered the appellant when shown the color photos. Cynthia A confirmed her identification when Lori J brought the appellant to Zayres for a brief personal meeting with her, but despite an intensive effort to jog her memory by review of store security records Cynthia A was not able to establish the appellant's presence on 20 April—only an approximate time of 2015 on some evening in the spring. Lori J reported her findings to Mr. K who did not follow up. In fact, neither Cynthia A nor Pam B was subpoenaed or scheduled to appear but instead, on the night before he wanted Cynthia A to testify, Mr. K sent Lori J on a frantic search for her. Cynthia A was finally located only hours before she was needed to testify. The evidence is in conflict whether Mr. K and Cynthia A met shortly before her testimony. According to Cynthia A, upon appearing at court she was put on the stand without ever meeting

Mr. K. In contrast, Mr. K says he spoke with her for about 10 or 15 minutes just before she testified. We see no need to resolve this conflict (although some doubt is cast on Mr. K's claim by his reference to Cynthia A with an incorrect surname when he began his direct-examination of her) because, even accepting Mr. K's version, the brevity and belated timing of the alleged meeting make it of questionable value. Despite Mr. K's optimistic prediction of a solid alibi in his opening argument, Cynthia A could not place the appellant in Zayres on the night Mrs. S was assaulted. Pam B's imperfect recollection was presented by testimonial stipulation without prior personal or telephone interview by Mr. K.

The *DuBay* hearing added a new dimension to the appellant's claim of ineffective representation. Pam B reiterated her specific identification of the appellant but was still unable to fix the date of their meeting, except that it occurred in April 1983. Cynthia A, however, in contrast to her earlier appearance testified that her review of additional Zayres security department records had refreshed her memory so that she was now able to recall the specific date when she saw the appellant in Zayres. In particular, she pointed out that she had generally recognized the appellant when shown photos by Lori J and that the personal meeting confirmed her identification; she remembered the time of day because in the course of accomplishing a task performed about 2000 each evening she was interrupted to investigate a potential shoplifter. She testified that the individual in question turned out to be the appellant, whom she discounted as a suspect after a brief period of surveillance, but the event nevertheless stuck in her mind. She further explained that, in attempting to pinpoint the date of the appellant's visit to the store, she studied security records and was reminded that she had participated in two apprehensions on 20 April, but she still could not specifically fit the appellant into a date and was not willing to testify at trial to a certainty she did not feel. Subsequently, according to her testimony, she looked at photos of

the two shoplifters she had apprehended on 20 April (maintained in Zayres' security records), and one of the photos caused her to make the connection between the appellant and 20 April through a mental process she was not further able to articulate.

██ Keeping in mind the Supreme Court's admonitions to apply a strong presumption of competency and to avoid the potential distortion of hindsight, we have comprehensively analyzed the evidence presented by Mr. K and the other witnesses regarding his preparation for trial and his performance therein, and we are led ineluctably to several conclusions. Mr. K was not required to prepare every aspect of the case personally and could properly delegate some functions to associates and agents. Furthermore, he was not under a duty to exploit every possible lead, motion or defense, due to obvious limitations on time, resources and personal involvement. He was, however, required to make a reasonable evaluation of his options and, once having chosen a strategy, he was required to make a reasonable effort to develop a supporting case, bringing "to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland*, 466 U.S. at ——, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. In this instance he selected an alibi defense and we will defer to that choice as reasonable under the circumstances. But what did he then do to investigate, marshal the evidence and present his case? Perhaps he could not have been expected to interview personally all or most of the alibi witnesses, as it is understandable that he had other duties in the case and other clients. We are astonished, though, by his failure to effectively interview *any* alibi witness under the circumstances of this case. By his own admission Zayres was only a short driving distance from his office and he had a telephone available. Yet he neither made an effective personal effort to interview or prepare even his key alibi witness, Cynthia A, whom he identified readily as "outcome-determinative," nor used his available and qualified military assistant counsel for these tasks, but instead relied solely on an inexperienced investigator and a summary report prepared by government representatives. All this is especially troubling to us because Mr. K repeatedly turned aside inquiries at the *DuBay* hearing regarding his decisions to forgo other tactics and strategies with the explanation that he did not want to distract the members or divert resources from his chosen alibi defense. Such performance is hardly indicative of a "diligent and conscientious advocate." *See Rivas* 3 M.J. at 288.

### B

██ Despite our misgivings about the quality of Mr. K's representation, we need not make a determination that he was actually ineffective, but instead may proceed directly to the issue of prejudice. *See Strickland*, 466 U.S. at ——, 104 S.Ct. at 2069–2070, 80 L.Ed.2d at 699. In some instances prejudice is presumed: for example, denial of the assistance of counsel altogether, *Strickland*, 466 U.S. at ——, 104 S.Ct. at 2067, 80 L.Ed.2d at 696; various kinds of government interference with assistance of counsel, *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); actual conflict of interest, *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); the defense counsel's complete failure to subject the Government's case to a meaningful adversarial testing, *Cronic*, 104 S.Ct. at 2047. As this case does not fall into any of the foregoing categories, however, the accused must affirmatively prove prejudice, i.e., he must show specific errors of counsel that undermine the reliability of the finding of guilty. *Strickland*, 466 U.S. at ——, 104 S.Ct. at 2064, 2068, 80 L.Ed.2d at 693, 697. The burden is not light, as it must be shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*, 466 U.S. at ——, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. A "reasonable probability" is defined as a "probability sufficient to undermine confidence in the outcome." *Id.* The focus is on the adversarial nature of the trial as a

reasonable means for promoting fairness, and relief is not warranted absent a "breakdown in the adversary process that renders the result [of the trial] unreliable." *Id.,* 466 U.S. at —, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. Out of the different tests applied by the various federal circuits the Supreme Court in *Strickland* chose a relatively strict one. This choice was influenced by several factors: avoiding manipulation by a disgruntled accused; recognizing that the situation does not involve government fault, interference or misconduct; and acknowledging that the Government is not responsible for an accused's choice of hired counsel and is limited in preventing ineffective assistance by that chosen counsel. *See Strickland,* 466 U.S. at —, 104 S.Ct. at 2066–2067, 80 L.Ed.2d at 695, 697.

■ The present situation contrasts with adequacy of counsel cases where the cause-effect linkage between ineffectiveness and prejudice is relatively well-defined. Although superficial examination of the matters asserted by the appellant could lead to the conclusion that Mr. K's failure to pursue two possible alibi witnesses prejudiced the appellant's case, closer scrutiny of the facts reveals the weakness of the appellant's position. Mrs. S, the victim, provided direct evidence of the appellant's guilt in her testimony at trial. She related having received a telephone call at her residence in Spanish Gardens, Triangle, Virginia, on 20 April 1983, from an unidentified person claiming he was a military policeman who indicated that her husband, Lance Corporal S, had been seriously injured in an accident. Mrs. S's husband was a military policeman attached to the PMO, MCDEC, Quantico, Virginia, and was working the 1500 to 2300 evening shift on that day as a dispatcher. The caller advised Mrs. S that he would send someone to meet her at the apartment parking lot to take her to her husband. The caller's voice sounded official, and Mrs. S did not suspect that she was being set up. When she arrived at the parking lot just minutes after receiving the call, a car backed up to where she was standing. The driver identified himself as a Criminal In-

vestigative Division (CID) agent and asked if she was Mrs. S, after which she entered his vehicle, and they proceeded toward Area 4 aboard the base. Mrs. S recalled looking at the driver during the course of attempts to solicit information about the condition of her husband and lighting the driver's cigarette, but she related that the driver had little to say. She also smoked several Marlboro Light cigarettes, discarding the butts in a pull-down ashtray in the middle of the dashboard, and remembered seeing an object dangling by a string from the rear view mirror. She described the item as "not perfectly square, but rectangular or long." The driver appeared to be lost at one point and stopped the vehicle to search through a container in the back seat that Mrs. S described as round, metallic, and similar to a drawing she identified on the bottom part of Prosecution Exhibit 22. As the driver was searching through the container, she heard what she described as a clanging noise. She remained unwary, however, as the driver advised her he was looking for a radio, which was consistent with her belief that he had become lost. She realized his true intentions for the first time when he pulled into a secluded area and announced, "Okay, here we are." Now understanding her peril, Mrs. S attempted to escape from the vehicle through the front seat passenger door, but the driver brandished a weapon she described as a knife with a 4 to 6 inch blade and "possibly" with hilts on the side. After she pleaded for her life, the driver forced her to masturbate him and to commit an act of fellatio upon him. He also raped and taunted her by saying, "Do you do this to S ...?" referring to her husband, Lance Corporal S. The assailant then forced Mrs. S to exit the vehicle on the passenger side and walk into the woods, where he ordered her to lie on the ground. There he choked her into unconsciousness as she struggled to save herself. Upon regaining consciousness, she remembered the assailant standing above her "swinging his arms back and forth and laughing in a weird way" while holding a knife in his hand. She later

realized she had been stabbed and slashed in the throat. After the appellant departed, Mrs. S summoned her remaining strength and walked along the road until she could flag down a passing car whose occupants took her to a hospital for treatment. A medical examination determined that the knife wounds to her neck were life-threatening even though they fortuitously missed her windpipe and jugular vein.

From the beginning Mrs. S provided criminal investigators with a detailed description of her assailant and his automobile. She described him as black, five-six to five-eight in height, 24 to 28 years of age, medium build, Marine-style haircut, no facial hair, wearing a padded jacket (possibly tan, yellow, or light brown in color) of slippery material, and wearing black cotton or khaki trousers. She also reported that her assailant was wearing dark-framed, nonmilitary glasses which were neither perfectly round nor square. She assisted criminal investigators in preparing a composite sketch of her assailant (Prosecution Exhibit 13) and later identified the appellant as her attacker in both photographic and physical line-ups (Prosecution Exhibit 19, photograph number 4 and Prosecution Exhibit 20, person number 5, respectively). She admitted there were similarities between the appellant and one other person appearing in each of the line-ups, but in the first she chose the appellant's photograph because the lips of the other person were too thick, and in the second she picked out the appellant rather than the other person in the physical line-up because the appellant scared her the most. At trial Mrs. S positively identified the appellant as her attacker and testified that she had been 99 percent certain at the physical line-up that the appellant was the person who attacked her but did not unequivocally identify him then because she wanted to be certain. Additionally, Mrs. S provided criminal investigators with a detailed description of the appellant's vehicle. She characterized it as a two-door car of medium size with matching exterior and interior color (tan, yellow, or gold), bench seats, pull-down ashtray in the middle of the dashboard, small gas gauge on the left side of the dashboard, and padded steering wheel. She also called attention to the peculiar object hanging from the rear view mirror and to the metallic container in the backseat. Subsequently, during the course of a random tour through various parking lots aboard the base Mrs. S positively identified the appellant's car by reference to all the items she had previously described except the hanging object (removed earlier by investigators) and the metallic container (not in the vehicle when previously searched), which were absent from the vehicle. Photographs of the interior and exterior of the appellant's automobile, taken before Mrs. S identified it as the one in which she was assaulted, illustrate the specific features described by Mrs. S, including the padded steering wheel, the object hanging from the rear view mirror, and bench seats (Prosecution Exhibit 24); the pull-down ashtray in the middle of the dashboard (Prosecution Exhibit 25); the matching light-colored exterior and interior (Prosecution Exhibit 26); and the small round gas gauge on the left side of the dashboard (Prosecution Exhibit 27). The only remarkable characteristics of the appellant's car absent from Mrs. S's identification were the white vinyl half-roof, (depicted in Prosecution Exhibit 27), and the exact make (a 1976 Buick Skylark.) In explaining her confusion about the make, Mrs. S testified that prior to the night she was assaulted she did not know what a Buick Skylark looked like and her only frame of reference was a Plymouth Duster or Chevrolet Nova, which she named in her description of the car. Prosecution Exhibit 25 depicts the front seat floorboard on the passenger side which was damp when the car was searched on the day after the assault, according to Officer L (a trained crime scene investigator). He also testified there were small marks on the front passenger side window and smaller water spots on the passenger side interior door panel, indicating the vehicle had been wiped on the passenger side. He further testified the pas-

senger side dashboard had been wiped, and there was haze on all the windows from smoke in the car except for the passenger side front and side windows. The pull-down ashtray in the middle of the dashboard was empty, although there were cigarette butts and residue in the rear seat ashtrays. The remainder of the vehicle was dusty and dirty and had neither been scrubbed nor wiped. Officer L additionally testified that he seized a rectangular object which he found hanging from the rear view mirror (depicted in Prosecution Exhibit 28), and that he was unable to lift identifiable fingerprints from the appellant's vehicle. Material vacuumed from the vehicle was tested but did not link Mrs. S to the appellant's vehicle, according to the testimony of NIS Special Agent L.

The appellant's pretrial statements to criminal investigators and his in-court testimony, rather than exculpating him, actually reveal direct evidence of a criminal state of mind and circumstantial evidence of guilt when viewed in relation to all the evidence of record. On the day after the offenses the appellant, who was training to be a CID agent while attached to the base PMO, gratuitously asked a military criminal investigator if he was a suspect even before being advised that he indeed was suspected of assaulting Mrs. S. He further inquired about whether Mrs. S had been administered a rape test and how long semen could be detected in a rape victim. The appellant also denied wiping and washing down the front seat area on the passenger side of his car. He accused Officer L of lying about finding an empty pull-down front seat ashtray and specifically recalled investigators emptying the contents of the front seat ashtray into a bag. In explaining his movements the appellant testified that he visited the Spanish Garden Apartments on four separate occasions during the afternoon and early evening hours of 20 April in the course of cleaning up and checking out of an apartment which he and his wife had vacated; that he left the Spanish Garden Apartments for the last time about 1925 on 20 April, less than an hour before Mrs. S received the anonymous telephone call, and that he then proceeded directly to PMO for the purpose of calling his wife to tell her he had finished cleaning the apartment, to use the restroom, and to weigh himself. He further testified that he arrived at PMO at approximately 1930 wearing a maroon jacket (depicted in Defense Exhibit C), green sateens, brown suede-like shoes, and a brown cap, but while there he decided against calling his wife because she would want him to come home and he instead chose to shop for her birthday present. He denied that his sole purpose for going to PMO was to determine if Mrs. S's husband, Lance Corporal S, was on duty, but admitted failing to tell criminal investigators that he had stopped at PMO after leaving the Spanish Garden Apartments when he was first interrogated. He further admitted initially claiming that he went directly from the Spanish Garden Apartments to Dumfries Pharmacy in Dumfries, Virginia, a relatively short distance from the Spanish Garden Apartments, to buy a birthday present for his wife. His admission that he stopped at PMO before going to Dumfries Pharmacy came only after he learned that a witness (Captain U) remembered seeing him at PMO between the hours of 1930 and 2000 on 20 April, but at trial the appellant claimed he did not initially tell investigators about stopping at PMO because he was aggressively being questioned, became confused and it "slipped" his mind. The appellant further testified that he was at PMO for only about 5 to 6 minutes, leaving there about 1935. After that he proceeded directly to Dumfries Pharmacy, arriving there about 1950, and purchased a foot massager as a birthday present for his wife. Despite his assertion that he was anxious to go home, as his pregnant wife was alone and in a new apartment, he nevertheless opted to leave Dumfries, where he lived, and go to Zayres Department Store, in Woodbridge, Virginia, some 11 to 12 miles away. He left Dumfries about 2000 to 2005, according to his testimony. Upon arriving at Zayres, instead of immediately searching for an appropriate

birthday present for his wife, he spent 15 to 20 minutes browsing in the men's department and then looked for a birthday present but soon gave up, realizing that he could shop the following day when his wife was at work. Before leaving Zayres at approximately 2030 to 2035, he further delayed his return home by stopping at the soda fountain to purchase a soft drink from a clerk, Pam B, whose name he overheard in the course of making his purchase. The appellant then returned to Dumfries and stopped there once again, according to his testimony, at the Quickee Drive-in to buy ice cream for his wife. By that time it was approximately 2050 hours and the drive-in was closed when he approached the window for service, although there were personnel inside the store whose stipulated testimony shows that none of them recall seeing the appellant at the drive-in window on the night in question. From there appellant proceeded directly to his apartment only a short distance away, arriving at approximately 2055. He joined his wife in bed about 2105. The appellant's wife estimated his arrival at 2100 to 2115, when questioned by criminal investigators.

Forensic analysis was inconclusive and neither inculpated nor exculpated the appellant. Although semen was recovered from Mrs. S in the course of a physical examination, it was not of sufficient quantity to permit determination of blood typing, and the clothing of the appellant and Mrs. S revealed no exchange of blood. Although a black person's hair found on Mrs. S's clothing could be matched to neither the appellant nor his wife, that hair could have been transferred to Mrs. S by persons or objects she contacted any time while wearing the same garment. Several other parts of the evidence, however, point to the appellant as the assailant of Mrs. S. First, the metallic container described by Mrs. S as being in the back seat of her assailant's car is useful in tracing the appellant's attempt to escape responsibility for his crimes. According to Master Sergeant M, a military investigator, the appellant initially claimed that he had a green plastic bucket in his car on the evening of 20 April but later, when he realized that investigators had seized a metallic container with cleaning material in it from his residence, admitted to them that he instead had a metallic container in his car. At trial, however, the appellant insisted that he had the green bucket in his car, that he never admitted having the metallic container in his car, and that Master Sergeant M was lying. At trial, the appellant's wife corroborated his testimony that he used the green plastic bucket to clean the apartment, and further testified that she pointed out the green plastic bucket to CID investigator, Master Sergeant M, as the one her husband used that night, but that Master Sergeant M took the metallic container which was located in a box in her bedroom. Master Sergeant M, however, testified that when he approached the appellant's wife at her apartment and asked about the materials that the appellant used to clean the apartment, she denied knowing what he had taken, but pointed to another part of the house and offered Master Sergeant M the opportunity to see for himself. Master Sergeant M proceeded to the area so indicated, but did not find a green plastic bucket. Instead, he found on the floor the metallic container identified in Prosecution Exhibit 23 containing several items of cleaning materials. Second, the appellant's apparel on the evening of 20 April warrants scrutiny. As part of his defense the appellant testified that he was wearing a maroon jacket on 20 April. He tried to substantiate his claim by testimony of a former neighbor, Tammy M, who saw him at the Spanish Gardens Apartments about noon on 20 April wearing a "burgundy" colored leather jacket and by testimony of his wife that he was wearing a maroon jacket on the evening of 20 April. The appellant contrasted this evidence with Mrs. S's description of her assailant's jacket as tan, yellow, or light brown. Other evidence, however, considerably undermines this aspect of the defense. According to Master Sergeant M, Mrs. Scott initially told him that she did not know what kind of jacket her husband was wearing on

the evening of 20 April. Also, it is significant that Captain U, the Legal Officer of the MCDEC Security Battalion, testified that the appellant was not wearing a maroon jacket when at PMO on the evening of 20 April about an hour before the offenses, but rather had on a tan or brownish-rust, waist-length jacket. Third, we note that the appellant admitted having seen Mrs. S on prior occasions and having recognized her because she was in the company of her husband, while Mrs. S testified that she did not recall ever seeing the appellant before the evening of 20 April. Finally, the knife admittedly borrowed by the appellant from his former landlord on the afternoon of 20 April to clean the stove of his apartment was similar in length to the knife wielded by Mrs. S's assailant. The landlord at trial depicted a steak knife about eight inches in length overall with a serrated blade about one-half inch in width. This was consistent with Mrs. S's description of her attacker's weapon as having a 4–6 inch blade and with the width of the stab wounds in the neck of Mrs. S, according to testimony of a medical officer. Although acknowledging that the knife was merely loaned to him, the appellant testified he discarded it, after completion of his cleaning chores, in a trash container. This explanation is unconvincing, as the landlord was present in the apartment when the appellant bagged up his trash, so that he could have easily returned the knife to its owner. Although the appellant attempted to distinguish the hiltless knife he borrowed from the description provided by Mrs. S of her assailant's knife, his reliance on this seeming difference is misplaced, as Mrs. S testified that she was not sure about the presence of hilts, and her lack of certainty is easily explained by her fright, distraction resulting from the criminal acts forced upon her at knife-point and by the poor lighting conditions at the time. These same factors account for minor differences between the appellant's eyeglasses and length of hair and the description Mrs. S provided, and for Mrs. S's failure to notice appellant's gold tooth, which was on the left side of his mouth and was turned away from her during most of their time together.

Against the strong proof of guilt supported by the record appellant can only conjecture that, had Mr. K performed his job effectively and in a timely manner interviewed witnesses Pam B and Cynthia A while the events on the evening of 20 April were still fresh in their minds, both witnesses would have provided the appellant with a credible alibi at trial, i.e., his presence at Zayres Department Store in Woodbridge at the time Mrs. S was in her assailant's car. A comparison between testimony of these witnesses at the *DuBay* hearing and the evidence of record, however, belies the appellant's claim. As we noted earlier, prior to the appellant's trial Pam B could not place him at Zayres on the evening of 20 April, according to the stipulation of her expected testimony entered at trial. At the subsequent *DuBay* hearing she testified that she recalled the appellant purchasing a soft drink from her sometime during April 1983 while wearing a maroon jacket and tan cap, but she still could not specify what date in April he appeared at Zayres because of the lapse of time. She did remember that on the evening of 20 April 1983 she clocked in at 1855 and worked until closing at 2200, and that she had seen the appellant in that store only once. Cynthia A placed the appellant at Zayres sometime during the spring of 1983 in her testimony at appellant's trial. She could not determine the exact date, although prior to trial she had observed the appellant personally in a show-up arranged by Lori J. At trial Cynthia A denied there was anything that might refresh her memory in this regard when asked the specific question, "You made two busts that day. Is there any way of associating those busts, those arrests with you seeing this gentleman?" referring to the appellant. Nevertheless, in her testimony at the *DuBay* hearing she claimed specific recollection based on review of photographs of shoplifters taken on the evening of 20 April 1983. She conceded that she was aware of those photographs when testifying at the trial and of their potential for refreshing

her memory, but that she did not make the trial judge or triers of fact aware of the existence of those photographs. Cynthia A attributed her lack of candor at trial to severe stress from personal matters and the unexpected, belated request to testify by the appellant's civilian defense counsel on the morning of the trial. Although claiming a law enforcement background, she admitted that she was not concerned enough about the outcome of the case to check her testimony by referring to the photographs after the trial. Only later, when approached by members of the appellant's new defense team, did she look at the photographs. We conclude that it is wishful thinking and sheer speculation to believe that Pam B would have provided the appellant an ironclad alibi had she been timely interviewed by the appellant's civilian defense counsel after he was retained, given the compelling evidence of appellant's guilt contained in the record of trial. The possibility that Cynthia A's latest version of events would be more believable than her testimony at the appellant's trial is equally speculative, given her questionable credibility reflected in her less-than-candid testimony at trial.

The heavy burden which the appellant must shoulder to establish prejudice has been emphasized by the Supreme Court, i.e., the test is a "reasonable probability that ... the result ... *would* have been different," *Strickland,* 466 U.S. at ——, 104 S.Ct. at 2068, 80 L.Ed.2d at 698 (emphasis added), not "might" have changed the result or "had some conceivable effect on the outcome" or "impaired the presentation of the defense." In fact, the Supreme Court specifically rejected these lesser tests and opted for the more exacting one. *Id.,* 466 U.S. at ——, 104 S.Ct. at 2067–2068, 80 L.Ed.2d at 697. Applying this strict test, we find that the expected testimony of neither Pam B nor Cynthia A creates a "reasonable probability" that the triers of fact would have had reasonable doubt in regard to appellant's guilt, given the compelling evidence of record leading directly to the appellant as

Mrs. S's assailant, based on her credible testimony identifying the appellant as her assailant and substantial evidence of record corroborating her testimony. Furthermore, the evidence of record could reasonably lead the triers of fact to conclude, as we do, that the appellant perjured himself at trial: (1) by denying he wiped and scrubbed down the front seat area on the passenger side of his vehicle, (2) by accusing Officer L of lying in regard to finding the pull-down ashtray in the middle of his dashboard empty and (3) by accusing Master Sergeant M of lying about the appellant's admission that he had a metallic container in his car on the day Mrs. S was assaulted, a container which was similar to the one described by Mrs. S as being in the back seat of the appellant's vehicle. We believe the appellant's perjured testimony reflects a guilty mind in regard to matters of significance bearing directly upon his guilt or innocence, and we cannot reconcile such testimony, given the evidence in this case, with any explanation other than the appellant's desperate attempt to avoid conviction and punishment for the heinous crimes he perpetrated upon Mrs. S.

Accordingly, we affirm the findings of guilty and sentence as approved on review below.

Judge GRANT concurs.

KERCHEVAL, Senior Judge (dissenting):

I dissent from the majority's refusal to determine whether the representation of appellant's trial defense counsel was "ineffective," and from their conclusion that the appellant suffered no prejudice from this, what I consider to be, constitutionally inadequate representation.

The case is before this Court once again,[1] following a *DuBay* hearing. *United States v. DuBay,* 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967). The verbatim record of that hearing is now also available for this

---

1. *See United States v. Scott,* 18 M.J. 629 (N.M.C. M.R.1984) for original decision.

Court's consideration. The issue before us is the same:

APPELLANT HAS BEEN DENIED EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE OF COUNSEL'S FAILURE TO ADEQUATELY INVESTIGATE AND INTERVIEW ALIBI WITNESSES.

Appellant was represented at trial by civilian counsel, Mr. K, and by detailed military counsel, Major (MAJ) R. The above-cited *DuBay* hearing received evidence on the issue of the level of defense counsel assistance rendered by Mr. K and MAJ R on behalf of appellant. Appellant's contention is and has been that he was denied the effective assistance of counsel mandated by the sixth amendment of the United States Constitution and related military and federal case law. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); *United States v. Jefferson*, 13 M.J. 1 (C.M.A.1982); *United States v. Rivas*, 3 M.J. 282 (C.M.A.1977); *United States v. Thompson*, No. 84 3413 (N.M.C.M.R. 28 June 1985). Appellant specifically asserts that Mr. K. failed to take timely and adequate steps in the preparation of appellant's defense, particularly with respect to appellant's alibi defense. He then specifies that the prejudicial impact of this inadequate pretrial preparation upon the presentation of appellant's defense created the reasonable probability that the outcome of trial would have been different. *See Strickland*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Jefferson*, 13 M.J. 1; *Thompson*, No. 84 3413 (N.M.C.M.R. 28 June 1985). The Government, while not conceding the defense attorney's deficiencies in the case, urges that even if there was defense counsel error, the weight of the government evidence at trial eliminates any reasonable probability of a different outcome.

Strenuous oral argument was held and briefs were submitted once again to this Court. In order to apply the facts in this case to the law, we must first decide what case law is applicable. Military courts have not historically developed their own unique case law on the issue of effectiveness of counsel, but have instead looked to federal standards for guidance. *Jefferson*, 13 M.J. at 5; *Rivas*, 3 M.J. at 287–288; *Thompson*, No. 84 3413 (N.M.C.M.R. 25 June 1985). Recently, the United States Supreme Court in *Strickland v. Washington, supra*, set out in-depth analyses and standards to be followed in determining the effectiveness of counsel representation in a given case.

The concerns of the military and this Court mirror those in *Strickland*. The fundamental right to a fair trial, important in both the military and civilian courts, is guaranteed by the Constitution through the due process clauses. The right to counsel, as set out in the sixth amendment, exists, and is necessary, in order to protect this fundamental right to a fair trial. *Strickland*, 466 U.S. at ——, 104 S.Ct. at 2063, 80 L.Ed.2d at 691. The adversarial system requires that an accused have sufficient access to a counsel's skill and knowledge in order to effectively meet the case of the Government. The fact that an accused is accompanied at trial by a person who happens to be a lawyer may not be sufficient to meet the requirements of the Constitution and the adversarial system. The lawyer must act in such a way as to ensure a fair trial. Therefore, "the right to counsel is the right to the effective assistance of counsel." *Strickland*, 466 U.S. at ——, 104 S.Ct. at 2064, 80 L.Ed.2d at 692 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970)).

As stated in *Strickland*, the underlying purpose for the requirement of effective assistance of counsel—to ensure an accused a fair trial—must be used as a guide in determining whether that requirement has been met. In order to be labeled "ineffective," counsel's representation must be such that "the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at ——, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. My brothers adopt the Supreme Court's two-prong test to deter-

mine if an accused has been denied such a fair trial due to defense counsel's ineffective assistance: appellant must show, first, that there was serious incompetence on the part of the defense counsel and; secondly, that there is a reasonable probability that this incompetence affected the trial result to appellant's prejudice. *Id.; see also United States v. DeCoster*, 624 F.2d 196 (D.C.Cir.1979) (*en banc* ), *cert. denied*, 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 311 (1979). I agree with the majority's adoption of this two-prong test. I disagree, however, with the result of their application of this test to the particular facts of the case at bar.

Looking initially to the first prong of the above test, whether there was a serious incompetence on the part of appellant's defense counsel, the appellant must show that his "counsel's representation fell below an objective standard of reasonableness ... considering all the circumstances." *Strickland*, 466 U.S. at ——, 104 S.Ct. at 2065, 80 L.Ed.2d 693–694. Care must be taken to "eliminate the distorting effects of hindsight ... and to evaluate the conduct [of counsel] from counsel's perspective at the time." *Id.*, 466 U.S. at ——, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. In the case *sub judice*, appellant has alleged that his counsel's pretrial preparation was inadequate. "[C]ounsel has a duty to make reasonable investigations [and preparation] or to make a reasonable decision that makes particular investigations [and preparation] unnecessary. In any ineffectiveness case, a particular decision not to investigate [or prepare] must be directly assessed for reasonableness in all the circumstances, [given the facts available to the defense counsel at the time and] applying a heavy measure of deference to counsel's judgments." *Id.*, 466 U.S. at ——, 104 S.Ct. at 2066, 80 L.Ed.2d at 695; *Thompson, supra. See also Moore v. United States*, 432 F.2d 730, 739 (3rd Cir.1970); *United States v. Bowie*, 17 M.J. 821, 824 (A.C.M.R.1984); *United States v. Dupas*, 17 M.J. 689 (A.C.M.R.1983). Specifically, appellant has alleged that his counsel failed to interview crucial alibi witnesses.

"Whether defense counsel's failure to interview witnesses renders his assistance ineffective depends on the facts of each case." *Cooley v. Nix*, 738 F.2d 345 (8th Cir.1984); *Langston v. Wyrick*, 698 F.2d 926 (8th Cir.1982).

Before gauging the amount and type of assistance rendered by Mr. K and MAJ R, one must look at their respective roles with regard to appellant's case. It is clear from the records of trial and the *DuBay* hearing that all parties concerned considered Mr. K as the lead counsel and MAJ R as his assistant in representing appellant. Paragraphs 42*a* and 46*d*, *Manual for Courts-Martial (1969), Rev.*, (MCM) (the Manual in effect at the time of appellant's trial), set out the duties of the appointed military counsel as being those which the civilian counsel, as the counsel in charge, may designate. When looking at the evidence presented then, one must consider first Mr. K's own actions in representing appellant and then the instructions he gave to MAJ R and other people aiding him with appellant's defense.

The evidence adduced at the *DuBay* hearing reveals that Mr. K was hired by the appellant on 22 April 1983, only two days after the rape of Mrs. S. The Article 32, 10 U.S.C. § 832, pretrial investigation was held on 1 June 1983. It was not until mid-September, only a couple of weeks before the trial itself, that any effort at all was made to contact the appellant's witnesses in order to verify his alibi. Even then such effort was initiated by the appellant himself, not by Mr. K, when appellant contacted a civil rights worker, Mrs. J, in order to seek some sort of assistance with his case. Mrs. J, a non-lawyer with absolutely no investigative experience, contacted Mr. K to offer her services free of charge. Mr. K asked her to go out and see if she could locate any alibi witnesses, *five months after the fact*. Mrs. J did in fact locate two potential alibi witnesses. Each was told by Mrs. J that Mr. K, the appellant's lawyer, would contact her to talk about what each knew. Mr. K, however, never contacted these potential alibi wit-

nesses but stated that he had relied on Mrs. J to develop their testimony—without ever actually directing her to do so. Thus, even after Mrs. J contacted these alibi witnesses and informed Mr. K of their existence and location, Mr. K took no steps to develop their testimony and prepare them for the upcoming trial. Furthermore, Mr. K chose not to utilize MAJ R, the appellant's detailed military counsel and Mr. K's co-counsel, for investigative purposes although MAJ R was an experienced attorney and available to be utilized for this purpose from the very beginning of the case. Mr. K never directed MAJ R to go out and find possible alibi witnesses, to develop the witnesses uncovered by Mrs. J, or to interview any other witnesses. MAJ R had very little, if any, pretrial contact with Mrs. J, and for that matter, was kept in the dark concerning Mr. K's preparations for trial as well. In short, there is a noticeable dearth of evidence that there was ever any type of defense team effort in preparing and investigating the defense case. Even the one possibly airtight alibi witness was not interviewed by Mr. K or MAJ R until minutes before she was to take the stand (Mr. K even relied on Mrs. J to get this witness to the trial, asking her to do so less than 24 hours beforehand). Additionally, Mr. K and MAJ R interviewed the victim only once before trial.

I find the most serious deficiency in Mr. K's representation to be in his investigation of the case against appellant and appellant's possible defense. There is no doubt that Mr. K knew of the existence of possible alibi witnesses from the very inception of his attorney-client relationship with the appellant, some two days following the attack on the victim. Although appellant told Mr. K where he had been on the evening of 20 April 1983, Mr. K never went to the three off-base stores to interview people that might have seen appellant during the time of the attack. Instead, Mr. K awaited the Naval Investigative Service (NIS) reports and relied on their fruitless interviews.

The second greatest area of counsel ineffectiveness is evident in the preparation, or lack thereof, of defense witnesses for trial. Mr. K did not prepare his witnesses for testifying at trial, nor did he prepare them for cross-examination. (Mr. K's explanation for this was that he expected them to simply tell the truth.) Not even appellant was prepared for his testimony or cross-examination.

I find that Mr. K's failure to adequately investigate his client's alibi, upon which rested appellant's exclusive and entire defense, and his failure to provide even a modicum of preparation for the trial appearance of appellant's alibi witnesses, falls far below reasonable standards of conduct for a defense attorney. It is beyond cavil that "representation involves more than the courtroom conduct of the advocate. The exercise of the utmost skill during the trial is not enough if counsel has neglected the necessary investigation and preparation of the case or failed to interview essential witnesses or to arrange for their attendance." *Moore v. United States*, 432 F.2d 730, 739 (3rd Cir.1970). I find nothing in the record of trial or in the record of the *DuBay* hearing which justifies counsel's failure to investigate or which would render the decision not to investigate a "reasonable decision." *Strickland*, 466 U.S. at ——, 104 S.Ct. at 2066, 80 L.Ed.2d at 695. I find Mr. K's failure to thoroughly investigate and to professionally prepare his client's alibi defense as being nothing short of astounding. The conduct of appellant's defense easily falls within any definition of "deficient" or "ineffective" under the *Strickland* test.

Of course, even though Mr. K's conduct was professionally unreasonable, the judgment of the trial court cannot be set aside if the erroneous conduct did not affect that judgment. *Strickland*, 466 U.S. at ——, 104 S.Ct. at 2069, 80 L.Ed.2d at 696. Although appellant "need not show that counsel's deficient conduct more likely than not altered the outcome in the case," he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. A reasonable probability is a probability

sufficient to undermine confidence in the outcome." *Id.,* 466 U.S. at ——, 104 S.Ct. at 2068–2069, 80 L.Ed.2d at 697–698. In other words, appellant must show that Mr. K's conduct of appellant's defense undermined the original assurances that the result of appellant's court-martial was reliable.

If the evidence of record of appellant's guilt "is so strong as to show no reasonable possibility of prejudice" then appellant's conviction must stand. *Jefferson,* 13 M.J. at 4. I disagree with the majority's holding that there was no such prejudice. The evidence presented against appellant was largely circumstantial and based solely on the victim's testimony and recollections. Appellant's car resembled that of her attacker; an item dangling from appellant's rearview mirror resembled a similar item which the victim remembered; a pot found in appellant's house resembled a pot which the victim remembered as being located in her attacker's car; a kitchen knife loaned to appellant earlier in the day was never returned and was similar to the one used on the victim; and the victim picked appellant and one other individual out of each of two different lineups. While the Government presented other circumstantial evidence, there was a lack of physical evidence which would have definitively tied appellant to the crime scene. There were no matching sperm samples, blood stains, clothing material or hair samples presented into evidence which would have placed appellant at the scene or with the victim. In fact, the only negroid hair found on the victim did not belong to the appellant and came from an undetermined source. This lack of physical evidence is so even though doctors, and then NIS, had access to the victim immediately after the offense, and NIS had access to appellant shortly thereafter.

In looking *solely* at the record of trial, I find that the evidence presented against appellant at trial was sufficient to prove his guilt beyond a reasonable doubt. Through the record of the *DuBay* hearing, however, the Court has now been presented with evidence that appellant was provided with a deficiently prepared defense, one containing an apparently iron-clad alibi witness who was neither sufficiently developed nor prepared for her testimony at trial. Because of the adversarial nature of a contested criminal trial, the presentation of a defense case depends on the quality and weight of the defense evidence. Moreover, the quality of presentation of that evidence can win or lose a case. When the underlying evidence, however, has not been properly investigated or prepared, no amount of work at trial is going to remedy the situation. Contrary to the majority, I cannot find that had appellant's defense case been properly investigated and prepared, that the Government's evidence would have necessarily been strong enough to sustain guilty findings beyond a reasonable doubt. *See Thompson, supra.* My confidence in the outcome of appellant's court-martial has been so sufficiently undermined by the evidence presented at the *DuBay* hearing that I would set aside the findings of guilty and sentence and return the record of trial to the convening authority authorizing a rehearing if practicable.